IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES,

     v.                                               Case No.: 3:13cr48/RV

CHARLES KOKESH
_____/

**ORDER**

This criminal case was tried before a jury from October 30, 2013, through November 1, 2013. At the conclusion of the evidence, I granted the defendant's motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. This order will memorialize my oral ruling.

**I. Background**[1]

During the time period relevant to this case, the defendant, Charles Kokesh, was a resident of New Mexico.[2] In 2006, he imported two African elephant tusks from Namibia. The tusks were trophies from a hunting safari that he had previously taken in that country, and there is no dispute that they were lawfully acquired and legally imported into the United States. Several years later, in November 2011, the defendant contacted a friendly acquaintance, Duke McCaa, Sr., a federally licensed

---

[1] In deciding a motion for judgment of acquittal, all evidence must be viewed in a light most favorable to the government, together with all reasonable inferences drawn therefrom, to determine if there is substantial evidence from which the jury could find the defendant guilty beyond a reasonable doubt. See, e.g., United States v. Gregory, 730 F.2d 692, 706 (11th Cir. 1984). Therefore, all the evidence at trial and set forth above will be construed in the light most favorable to the prosecution.

[2] A successful businessman, Kokesh received his undergraduate and MBA degrees from Harvard University, and his law degree from University of California, Berkeley. Among his businesses, he was an equity owner and President of Dakota Firearms, a gun manufacturer.

firearms dealer located in Gulf Breeze, Florida, about the possibility of him selling the tusks or using them to barter for guns. Because he had seen the defendant's name on the internet as having been under indictment for a crime (later determined to be a matter of mistaken identity), McCaa believed it was against the law for the defendant to purchase firearms. He then contacted a special agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), who, in turn, after hearing about the tusks, contacted a special agent with the Fish and Wildlife Service ("FWS"). These agents proceeded to use McCaa as a "confidential informant" and record numerous phone calls between McCaa and the defendant. The defendant shipped the tusks to McCaa on or about December 2, 2011, and one was severely damaged (cracked) in transit. The defendant filed an insurance claim on it in mid-December.

The defendant testified that he relied on McCaa, who deals in elephant ivory, for a determination whether the tusks could be legally traded, and that he was also interested in selling several expensive guns to McCaa in the deal. However, viewing all the evidence in a light most favorable to the government, the defendant appears to have eventually believed what he was doing with the tusks was against the law, so he and McCaa devised a phony "cover story" about him donating the tusks to a museum and shipping them to McCaa for an appraisal (McCaa was an experienced appraiser, and this would have been legal). The defendant learned of the ATF/FWS investigation on December 30, 2011, and from that point forward the transaction with McCaa was aborted and no longer being pursued.[3] Thereafter, by email dated January 3, 2012, and letter dated January 16, 2012, the defendant wrote to FWS and indicated that he was donating the tusks to the museum.

Based on the foregoing, the defendant was charged by indictment with one count of engaging in interstate sale and transport of elephant tusks, in violation of

---

[3] The defendant later returned a check in the amount of $3,600 that he had previously received from McCaa as partial payment.

*Case No.: 3:13cr48/RV*

the Endangered Species Act [16 U.S.C. §§ 1531, et seq.] ("ESA") (count 1), and two counts of making or submitting a false record and account of wildlife (namely, the January 3rd email and the January 16th letter), in violation of the Lacey Act [16 U.S.C. §§ 3371, et seq.] (counts 2 and 3).[4]

## II. Relevant Law

The Convention on International Trade in Endangered Species ("CITES") is an international treaty to which the United States is a signatory. It regulates the trade and transport of species that are currently (or may become in the future) threatened with extinction due to commercial trade, including the African elephant. However, subject to conditions, there is an exception that allows elephants killed on safari in certain designated preserves in Africa to be lawfully brought into the United States and kept as sport trophies.

CITES is implemented in the United States through ESA. Section 1540(b)(1) of ESA provides that anyone who knowingly violates a regulation issued in order to implement the statute shall be guilty of a crime. One such regulation --- the one at issue here --- is found at Title 50, Code of Federal Regulations, Section 23.55, and it states that any species identified in Appendix II of CITES (a group that includes African elephants) "may be used, including a transfer, donation, or exchange, only for noncommercial purposes." 50 C.F.R. § 23.55(b). "Commercial" means "related to an activity, including actual or intended import, export, re-export, sale, offer for sale, purchase, transfer, donation, exchange, or provision of a service, that is reasonably likely to result in economic use, gain, or benefit[.]" 50 C.F.R. § 23.5. "Noncommercial", of course, means "an activity that is not commercial." See id. According to the government's reading of the foregoing statutory and regulatory scheme, a person in possession of elephant tusks --- even lawfully-obtained sport

---

[4] Although the defendant drafted the January 16th letter, as the government has acknowledged, there is no evidence that he ever actually sent it to FWS.

*Case No.: 3:13cr48/RV*

trophies --- may transfer or donate them for noncommercial purposes, but he may not sell or transfer them for commercial gain.

    The defendant was also charged in two counts under the Lacey Act. The Eleventh Circuit has described the history and purpose of the statute as follows:

> The Lacey Act was introduced by Representative John F. Lacey of Iowa in 1900. Representative Lacey recognized that individual states were unable to protect their wildlife, because their laws did not reach into neighboring states. Thus, he asserted that a federal law was necessary to outlaw the interstate traffic in wildlife illegally taken from their state of origin. By 1981 Congress recognized the need to strengthen the Lacey Act in response to the massive illegal trade in fish, wildlife and plants. Congress thus amended the Act in 1981 to correct insufficiencies in the Act and simplify administration and enforcement.
>
>                                  \* \* \*
>
> [T]he legislative history reflects that the [main] thrust of Congress's intention in amending the Act was to expand its scope and enhance its deterrence effect. Indeed, Congress clearly stated that the amendments were meant to strengthen the existing wildlife protection laws and to provide [the government] the tools needed to effectively control the massive illegal trade in fish, wildlife and plants. The Senate Report provided that the amendments would allow the Federal Government to provide more adequate support for the full range of State, foreign and Federal laws that protect wildlife. The amendments were intended to raise both the civil and criminal penalties of the current laws and target commercial violators and international traffickers. By strengthening the penalty provisions of the Lacey Act, Congress intended to give the Federal Government stronger enforcement tools to stop the large-scale importation and taking of fish which enjoy protection under other foreign laws.

See United States v. McNab, 331 F.3d 1228, 1238-39 (11th Cir. 2003) (citations, quotation marks, and alterations omitted). One part of the Lacey Act amendments

covers "false labeling" offenses. It prohibits, in pertinent part, false labeling of fish, wildlife or plants that are imported, exported, or transported in interstate or foreign commerce. Specifically, the statute provides that:

> It is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been, or is intended to be —
> . . .
> (2) transported in interstate or foreign commerce.

16 U.S.C. § 3372(d). Cases arising under this section most frequently --- but not always --- involve the situation where someone falsely labels or misrepresents the size, amount, or type of fish/wildlife that is intended for sale on the open market. See, e.g., United States v. Bruce, 437 Fed. Appx. 357 (6th Cir. 2011) (defendants charged with mislabeling undersized mussels); United States v. Bemka Corp., 368 Fed. Appx. 941 (11th Cir. 2010) (defendant charged with mislabeling shipments of paddlefish roe as bowfin roe); United States v. Panhandle Trading, Inc., 2006 WL 2587685 (N.D. Fla. 2006) (defendants charged with mislabeling frozen catfish filets as grouper filets); United States v. Hughes, 2001 WL 274823 (D.N.H. 2001) (defendants charged with catching illegal amount of codfish and then making false representations on government forms). If the false representation involves the sale of fish or wildlife valued at more than $350, the violator may be fined $250,000 and sentenced to five years in prison; if it does not involve such conduct, he may be fined and sentenced to one year in prison. See 16 U.S.C. § 3373(d)(3)(A)-(B).

**III. Discussion**

A. The ESA count

At the close of the government's case-in-chief, and again at the close of his, the defendant moved for judgment of acquittal on count 1 based on the argument that the regulation he was charged with violating did not apply to the sale at issue. I agreed with defendant and granted his motion. Before setting forth my reasoning,

however, I must say a few brief words about the crime charged and the mens rea that is required.

The defendant is charged in count 1 with violating Title 16, United States Code, Section 1540(b)(1). This provision states, in part, that: "Any person who knowingly violates [one of the ESA's regulations]" is subject to criminal penalties. The regulation that the defendant is alleged to have violated in this case is Title 50, Code of Federal Regulations, Section 23.55. While the government has maintained, and the Fifth Circuit has held [see United States v. Nguyen, 916 F.2d 1016 (5th Cir. 1990)], that a violation of Section 1540 is a general intent crime, based on binding precedent in our circuit, see United States v. Grigsby, 111 F.3d 806, 816-19 (11th Cir. 1997), I disagree. As the Eleventh Circuit expressly stated in Grigsby: "[T]he adverb 'knowingly' modifies the verb 'violates' and connotes deliberate, cognitive or specific intent as a requirement for criminal violation [of the ESA]." Id. at 819.[5]

Therefore, consistent with Grigsby, the ESA count as charged in count 1 of the indictment is a "specific intent" crime. This means that the government must prove that the defendant acted "willfully", i.e., voluntarily and purposely, with the intent and "bad purpose" to do something the law forbids. See, e.g., United States v. Starks, 157 F.3d 833, 837-38 (11th Cir. 1998). As previously stated, there was

---

[5] I recognize that Grigsby was interpreting the African Elephant Conservation Act ("AECA"). However, the AECA is part of ESA, and the two statutes are similar in purpose and use similar (in fact, virtually "identical") language. See generally 111 F.3d at 814-17; compare 16 U.S.C. § 4224(a) ("Whoever knowingly violates" the AECA is subject to criminal penalties) with 16 U.S.C. § 1540(b)(1) ("Any person who knowingly violates" the ESA is subject to criminal penalties). I also recognize that the Grigsby court highlighted a difference in language in the civil and criminal penalty provisions in the AECA; specifically, the former did not require the violator to act "knowingly", whereas the latter did (a circumstance not present in the ESA, because both the civil and criminal penalty provisions require "knowing" conduct). However, the case did not hinge on this difference in statutory language; it merely "bolster[ed]" the court's conclusion. See 111 F.3d at 819 n.21.

*Case No.: 3:13cr48/RV*

some evidence at trial from which a reasonable jury could find that the defendant <u>thought</u> he was breaking the law. However, if he was wrong --- and what he was doing was not illegal --- then he did not commit any crime, even though he may have had the intent to do so. <u>See</u> <u>generally</u> <u>United States v. Oviedo</u>, 525 F.2d 881 (5th Cir. 1976) (expressly rejecting the view that someone who incorrectly thought he was violating the law could be convicted of "mens rea simpliciter"; holding that to be guilty of a crime, "the objective acts performed, <u>without any reliance on the accompanying mens rea</u>, [must] mark defendant's conduct as criminal in nature") (emphasis added); <u>see</u> <u>also</u> <u>United States v. Berrigan</u>, 482 F.2d 171 (3d Cir. 1973) (refusing to "impose criminal liability upon mere intent, where the will is to be taken for the deed"; stating "it should need no demonstration that a person who commits or attempts to commit what is not a crime in law cannot be convicted [of a crime], and it makes no difference that he thinks it is", for to hold otherwise "would violate the principle of legality") (citations omitted).[6] The question here is thus: irrespective of what he may have thought, was the defendant, in fact, actually breaking the law when he sold (or attempted to sell) his sport-hunted elephant tusk trophies?

"It has long been settled that penal statutes are to be construed strictly, and that one is not to be subjected to a penalty unless the words of the statute plainly impose it." <u>United States v. Campos-Serrano</u>, 404 U.S. 293, 297, 92 S. Ct. 471, 30 L. Ed. 2d 457 (1971) (internal quotation marks and citations omitted); <u>see</u> <u>also</u> <u>United States v. Phipps</u>, 81 F.3d 1056, 1060 (11th Cir. 1996) (describing as "well settled" the view that "criminal laws are to be strictly construed"). A plain reading and strict construction of the regulations under ESA reveals the following.

---

[6] As the Third Circuit explained in <u>Berrigan</u>, the principle of legality --- that conduct may not be treated as criminal unless it has been clearly and expressly forbidden and codified in written law --- is "the fundament of American law" and regarded by Western democracies as the great charter of liberty. <u>Id.</u> at 186 n.27.

*Case No.: 3:13cr48/RV*

The pertinent regulations (of which Section 23.55(b) is a part) must be read together to understand the scope and intent. Title 50, Code of Federal Regulations, Section 23.1, expressly states that the purpose of the regulations and CITES is to ensure that the <u>international</u> trade of CITES-protected species is <u>legal</u> and does not threaten the survival of those species in the wild. Specifically, Section 23.1 states as follows:

> § 23.1 **What are the purposes of these regulations and CITES? . . .**
>
> (b) Purpose. The aim of CITES is to regulate **international trade** in wildlife and plants, including parts, products, and derivatives, to ensure it is <u>legal</u> and does not threaten the survival of species in the wild.

(Emphasis added). Section 23.2 of those same regulations then provides:

> § 23.2 **How do I decide if these regulations apply to my shipment or me?**
>
> Answer the following questions to decide if the regulations in this part apply to your proposed activity:
> (a) Is the wildlife or plant species . . . listed in Appendix I, II, or III of CITES (see § 23.91)?
>
> (1) YES. Continue to paragraph (b) of this section.
> (2) NO. The regulations in this part do not apply.
>
> (b) Is the wildlife or plant specimen exempted from CITES (see § 23.92)?
>
> (1) YES. The regulations in this part do not apply.
> (2) NO. Continue to paragraph (c) of this section.
>
> (c) Do you want to import, export, re-export, engage in international trade, or introduce from the sea?
>
> (1) YES. The regulations in this part apply.
> (2) NO. Continue to paragraph (d) of this section.

>   (d) Was the specimen that you possess or want to enter into intrastate or interstate commerce **[i] unlawfully acquired, [ii] illegally traded, or [iii] otherwise subject to conditions set out on a CITES document that authorized import?**
>
>   (1) YES. The regulations in this part apply. . . .
>   (2) **NO. The regulations in this part do not apply.**

(Emphasis added). Significantly, the FWS has interpreted this regulation as follows: "The possession and domestic trade of <u>legal</u> specimens are <u>not</u> regulated by CITES <u>unless</u> the specimens had been <u>traded internationally under specific conditions</u> of a CITES document <u>and the conditions still apply</u>." 72 Fed. Reg. 48402-01 (emphasis added).[7]

Section 23.2(d) is the only open question here as 23.2(a)-(c) are undisputed. As for subsection (d), it is also undisputed that neither [i] nor [ii] of that subsection applies, for the elephant tusks were not "unlawfully acquired" or "illegally traded." The question then boils down to whether the tusks were [iii] "<u>otherwise subject to conditions set out on a CITES document that authorized import</u>." If they were, then "YES. The regulations in this part apply" and the defendant was bound by Section 23.55. If, however, they were <u>not</u> subject to such conditions, then the answer is unequivocal: "NO. The regulations in this part do not apply." And if the regulations do not apply, then the defendant did not, as a matter of law and regardless of what he may have thought, violate the regulations. The defendant makes two arguments why the regulations "do not apply" to him on the facts of this case.

---

[7] Although perhaps not entitled to deference under <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), this official agency interpretation is nevertheless "entitled to respect" under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944).

*Case No.: 3:13cr48/RV*

Page 10 of  20

The defendant first contends that there is no record evidence of a "CITES document that authorized import", as required by Section 23.2(d)[iii]. While the record contains Namibia export documents, the defendant insists that an export document from a foreign country does not --- and, indeed, cannot --- constitute a "document that authorized import" into this country. Based on the plain language of the regulation (which must be given strict construction), I am inclined to agree with the defendant. It is very difficult to see how Namibia export documents can qualify as a "CITES document that authorized import." However, I do not have to decide the issue. Assuming, arguendo, that the Namibia export documents qualify as import-authorizing documents pursuant to CITES, there is another problem with the government's case, specifically, as defendant argues next, there is insufficient evidence that his imported sport trophy was "subject to conditions set out on" the Namibia export document and that those conditions "still apply."

After close and careful review of the Namibia Export Document, and for all the reasons given during my oral ruling on defendant's Rule 29 motion, I conclude that there are no "conditions set out on" the face of that document. Although the "special conditions" block (Block 5) is "populated" with reference to the Namibia Export Permit, that does not really help the government because neither the export document nor the export permit cited therein "set out" any conditions whatsoever.[8]

---

[8] The government has argued that it does not matter what was actually in the special conditions box. If it was "populated" with anything, that qualifies as "conditions set out on a CITES document", thereby satisfying Section 23.2(d)[iii]. The government has failed to cite --- and I have been unable to locate --- any case law to support such a broad and expansive interpretation of this regulation, which is not very surprising as such a reading would be unreasonable and defy common sense. For example, suppose that the box was "populated" with a series of letters or numbers in a random and nonsensical order. According to the government, that would be a "condition" that makes the regulations applicable. This would not only be inconsistent with the basic and "fundamental principle that no citizen should be

*Case No.: 3:13cr48/RV*

The only other even arguable condition listed in Block 5 of the Namibia Export Document pertains to boilerplate regulations involving live animals, which is a condition that does not "still apply" (and never did) to the tusks of a long-dead elephant.[9] Furthermore, the Declaration for Importation or Exportation of Fish or Wildlife from FWS also contains no "conditions."

Because there is insufficient evidence in the record that the tusks at issue were "subject to conditions set out on a CITES document that authorized import", the regulations by their very own terms "do not apply" and the defendant cannot be found guilty of violating Section 23.55. Based on the record before this court, then, the attempted sale of the defendant's hunting trophy was not a crime.

The Eleventh Circuit's decision in Grigsby, supra, 111 F.3d at 806, which is similar to this one in certain respects, reinforces my conclusion. The defendants in that case owned a taxidermy business in Canada, and they had in their possession several sport-hunted African elephant tusks from a deceased client. At some point, the defendants made the decision to relocate to Georgia. Apparently believing that it would be illegal to bring and sell the ivory in this country, they sneaked the tusks

---

held accountable for a violation of a [law] whose commands are uncertain" [United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008)], but it would be inconsistent with the FWS's own official interpretation of Section 23.2, which expressly provides: "The possession and domestic trade of legal specimens are not regulated by CITES unless the specimens had been traded internationally under specific conditions of a CITES document and the conditions still apply." See 72 Fed. Reg. 48402-01, 48405 (emphasis added).

[9] There is a part (Block 5a) of the Namibia Export Document that asks for the "purpose of the transaction", and it is populated with an "H" (the code that applies to hunting trophies). The government suggests that this is also a "condition", but I disagree. Presumably, any hunting trophy exported from Namibia (even ones taken from animals that are not protected by CITES and ESA) would also be designated with "H." That designation merely describes the purpose and nature of the export; it cannot be reasonably read to set forth a "condition."

across the border (hidden under a blanket in the back of a minivan), and later tried to sell them to a person who was cooperating with the FWS. The defendants were charged under the AECA and convicted by a jury. In reversing and remanding with instructions to enter judgment of acquittal, the Eleventh Circuit was critical of the federal government in bringing that case and expressed some doubt as to whether the AECA (which, once again, is similar in purpose and language to the ESA) was intended to reach small transactions involving lawfully-hunted ivory. See generally id. at 822-25 (stating that there was no evidence that the AECA was intended to apply to the "minuscule" and "limited" amount of legally sports-hunted ivory, but rather it was intended to apply to the "large illegal trade in African elephant ivory" and "to punish those who diminish African elephant populations for a commercial purpose, as opposed to [lawfully] sport-hunted elephants"). While not dispositive, this suggests that the AECA (and the ESA, by extension) was not meant to apply to the conduct at issue here, and it strengthens my conclusion that, pursuant to Section 23.2(d), the regulations "do not apply" and reach the conduct charged in this case.[10]

---

[10] During oral argument on the Rule 29 motion, the government suggested that Section 23.2 was poorly-worded and that it would be a "technicality" to grant acquittal based on that regulation because there is no evidence that the defendant read and relied on that provision in deciding whether he could sell the tusks. While I agree there is no evidence that defendant relied on (or even knew anything about) Section 23.2 before he tried to sell the ivory to McCaa, that is irrelevant. What the government regards as a "technicality" is, in fact, the actual and plain language of the regulation itself. That regulation provides that if the tusks were not "subject to conditions set out on a CITES document that authorized import" --- and, as stated above, there is no evidence here that they were --- then: "NO. The regulations . . . do not apply." That is not a technicality nor is it ambiguous. It is plain language of the law, and it sets forth when the regulations do and do not apply. The defendant does not have the burden to show that he read or relied on the regulations in good faith. Rather, the government has the burden to show that he violated them. This it failed to do.

For the foregoing reasons, judgment of acquittal is appropriate as to Count 1 and will be entered accordingly.

B. The Lacey Act counts

The defendant is charged in count 2 and count 3 with violations of the false labeling provisions of the Lacey Act. See 16 U.S.C. § 3372(d)(2). For these counts, the defendant moved for a judgment of acquittal on two separate grounds, the first of which can be resolved quickly.

The defendant first argued that the January 2011 email and letter to FWS that are the basis of the Lacey Act counts were drafted in New Mexico and had insufficient connection to the Northern District of Florida. Accordingly, he moved for judgment of acquittal after the close of evidence due to improper venue. It has been long and well-settled, however, that challenges to venue are waived if raised during trial. See, e.g., Silverberg v. United States, 4 F.2d 908, 909 (5th Cir. 1925) ("It was too late to raise the question [of improper venue] after the jury had been impaneled and the defendants had gone to trial on pleas of not guilty. Any rights that the defendants had to be tried [in another venue] could have been and were waived."); see also Lafoon v. United States, 250 F.2d 958, 959 (5th Cir. 1958) (venue in criminal trial "is a personal and technical right which can be waived").[11]

---

[11] To the extent the defendant has argued that he did not waive his venue objection because he raised the issue pre-trial in his proposed jury instructions, the argument fails for two reasons. First of all, he did not clearly and directly challenge venue in that filing. Rather, he merely proposed an instruction that required the jury to find that the January 2011 email and letter were made in, or transmitted to, this district. That single and oblique reference to venue is not the same thing as moving for judgment of acquittal (or moving to transfer) for improper venue. Second, even if the proposed jury instructions should have put the court and the government on notice that venue was going to be challenged in the case, the fact remains that the defendant filed his proposed jury instructions on October 25, 2013, more than four months after he was arraigned, and a mere five days before trial. At that late stage of the case, the venue issue was waived. See Cagnina v. United States, 223 F.2d

Thus, to the extent this case was brought in the improper venue (an issue which I need not decide), the argument was waived.

The defendant next argues that, even if everything in the record is viewed in the light most favorable to the government, there is insufficient evidence that he violated the Lacey Act's false labeling provisions. Before considering this argument, I must make a brief observation about the original intent of the Lacey Act and then discuss a significant issue concerning the elements of this offense.

Preliminarily, although it is not essential to my holding, I have reviewed the legislative background of the Lacey Act and other cases involving "false labeling," and it is doubtful that the statute was intended to apply to a case like this one. As the Eleventh Circuit has noted, the Lacey Act was introduced in 1900 because the states were unable to protect their own wildlife since their laws did not reach into other states. McNab, supra, 331 F.3d at 1238-39. The statute, as amended over the years, targeted "commercial violators and international traffickers" and was in "response to the massive illegal trade in fish, wildlife and plants" between states, and it was intended "to provide [the federal government with] the tools needed to effectively control [that] massive illegal trade . . . ." See id.; accord id. (Lacey Act was intended to "stop the large-scale importation and taking of fish [and wildlife]"). The statute was thus designed to stem the "massive" and "large scale" commercial trafficking of illegally taken fish and wildlife (or falsely labeled fish and wildlife). See id. (explaining that the statute was originally introduced and passed because federal law was deemed "necessary to outlaw the interstate traffic in wildlife illegally taken from their state of origin") (emphasis added). Because this case involved the private

---

149 (5th Cir. 1955) (district court properly denied motion based on improper venue where it was filed "too late," specifically, "weeks after arraignment and . . . about a week before trial"; noting that while proper venue in criminal trials is "important", venue is "not a non-waivable jurisdictional requirement or one which the defendant can raise at any time").

*Case No.: 3:13cr48/RV*

(and, as noted in the previous section, lawful) sale of a single sport trophy that was legally obtained, it is debatable whether the Lacey Act even applies.[12] Nevertheless, for purposes of this order, I will assume that, as a general matter, the statute could be read to reach the sort of conduct at issue.

Before the trial, the defendant and the government submitted proposed jury instructions for the Lacey Act counts. Both sides agreed that in order to prevail on these charges, the government would have to prove the following three elements:

1. That the defendant knowingly made or submitted a false record, account, label for, or identification of, wildlife, specifically two African elephant tusks;

2. That the wildlife had been or was intended to be transported in interstate or foreign commerce; and

3. That the offense involved the sale or purchase, offer of sale or purchase, or commission of any act with the intent to sell or purchase wildlife with a market value greater than $350.

---

[12] The statute is found in Title 16 "Conservation" and in Chapter 53 thereof, the caption of which reads: "Control of Illegally Taken Fish and Wildlife" (emphasis added). Although the title of a statute is not by itself dispositive, it can provide some insight into "the meaning of a statute." Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998) ("The title of the [statute] is 'Criminal penalties for reentry of certain deported aliens.' A title that contains the word 'penalties' more often, but certainly not always, signals a provision that deals with penalties for a substantive crime.") (emphasis in original); United States v. Cooper, 396 F.3d 308, 313 (3d Cir. 2005) ("[T]he chapter of the United States Code which contains the DNA Act significantly is entitled 'Violent Crime Control and Law Enforcement'. . . A chapter title that contains the words 'violent crime control' usually signals a provision concerning violent crimes."); California Independent System Operator Corp. v. FERC, 372 F.3d 395, 399 (D.C. Cir. 2004) (recognizing that section title of statute is not controlling or dispositive of its meaning, "but it is not too much to expect that it has something to do with the subject matter of the statute").

*Case No.: 3:13cr48/RV*

(Compare doc. 29 at 25, with doc. 32 at 5).[13] During trial, I asked the attorneys if the alleged false statements were required to involve a material fact --- that is, an important fact, not some unimportant or trivial detail, with the natural tendency to influence or is capable of influencing the recipient --- and both counsel replied that materiality was not an element of the offense. See United States v. Fountain, 277 F.3d 714, 717 (5th Cir. 2001) (holding that "materiality" is not required by Section 3372(d)). I disagree with counsel and the Fifth Circuit.

Section 3372(d)(2) provides that: "It is unlawful for any person to make or submit any false record [or account] for . . . any fish, wildlife, or plant which has been, or is intended to be . . . transported in interstate or foreign commerce." It is of course true, as the Fifth Circuit noted in Fountain, supra, 277 F.3d at 717, that the text of Section 3372(d)(2) does not explicitly contain a materiality requirement. Rather, on its face it would seem to apply to any mere "false record [or] account", whether material or not. However, I believe that materiality must be inferred in the statute for at least two reasons. Cf. Kungys v. United States, 485 U.S. 759, 781, 108 S. Ct. 1537, 99 L. Ed. 2d 839 (1988) (refusing to find materiality requirement in statute criminalizing "false testimony" in immigration proceedings, but going on to make clear that "we do not say that statutory use of the term 'false' or 'falsity' can never imply a requirement of materiality").

First, it is by now well established that materiality is an essential element of most, if not all, fraud offenses. See, e.g., Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); United States v. Wells, 519 U.S. 482, 117 S. Ct. 921, 137 L. Ed. 2d 107 (1997); United States v. Gaudin, 515 U.S. 506, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995); see generally 11th Circuit Pattern Jury

---

[13] As earlier noted, the defendant proposed an element in his jury instruction regarding venue in this district [see supra note 11], but that additional element has no substantive bearing on this discussion.

Instruction (Criminal) (2010) (citing to <u>Neder</u>, <u>Wells</u>, and <u>Gaudin</u> in annotations to fraud instructions, concluding that materiality is an element of fraud offenses, and recommending that juries be instructed accordingly). While Section 3372(d) is not explicitly a fraud offense, the Ninth Circuit has noted that even where fraud is not "'an explicit element'" of a charged offense, it can be said to involve fraud if "'the nature of the crime is inherently fraudulent.'" <u>See</u> <u>Hung Lin Wu v. Mukasey</u>, 288 Fed. Appx. 428, 429 (9th Cir. 2008) (citing <u>Navarro-Lopez v. Gonzales</u>, 503 F.3d 1063 (9th Cir. 2007)). Fraudulent means to "deceive or mislead someone," usually (but not always) for personal gain. <u>See</u>, <u>e.g.</u>, 11th Circuit Pattern Jury Instructions; <u>accord</u> Black's Law Dictionary 687 (8th ed. 2004) (defining fraudulent as "Conduct involving bad faith, dishonesty"). The government has argued throughout this case that defendant tried, in bad faith and dishonestly, to deceive and mislead the FWS with the allegedly false story about him donating the elephant tusks to a museum. This is the very definition of fraudulent conduct, and, consequently, I believe that materiality must be required.

      Furthermore, if materiality were not required, the statute could apply to and criminalize harmless and innocuous falsehoods. For example, suppose that a man posts an advertisement on the internet to sell a mounted deer head that he claims to have shot during a recent hunting trip when, in fact, the deer was actually shot by someone else. This is a "false record or account." If the man sells the mounted deer head for $355, and then ships it through interstate commerce, in the absence of a materiality requirement, this could constitute "false labeling" under the statute for which he could be fined $250,000 and sentenced up to five years incarceration. 16 U.S.C. § 3373(d)(3)(A). Or, if he simply shipped the deer to his son and wrote a letter falsely claiming to have shot the deer, he could be fined and sentenced up to one year in jail. 16 U.S.C. § 3373(d)(3)(B). I cannot read the statute to permit such

an absurd outcome.[14]

At bottom, I conclude that materiality is a required and essential element of this offense; without it, the federal government would have too much power under the statute. The Lacey Act is very broadly worded and, as just discussed, could be read to apply to a wide range of harmless conduct. Commentators have noted that, while the statute was intended to supplement state laws and protect wildlife and fish from "massive" and "large scale" interstate and foreign commercial trafficking, "in recent years, federal prosecutors have taken advantage of the Act's unusually broad scope and, in conjunction with other federal criminal statutes, have succeeded in obtaining surprisingly stiff prison sentences and financial penalties for Lacey Act violations", even minor "transgressions of technical, administrative rules and regulations." See Victor J. Rocco, Wildlife Conservation Under the Lacey Act, 80 N.Y. B.J. 10, 11 (May 2008). The statute is thus "capable of being misused" --- and arguably has been --- "as a convenient and potent tool to expand government's power." Id. at 14; accord id. at 11 (referring to the statute as "a formidable stealth bomber" in the government's prosecutorial arsenal). Requiring that the government prove that the falsity involved a material matter and was capable of defrauding --- like in the typical "false labeling" case involving misrepresentations about the size or type of fish and wildlife for sale --- will help reduce potential misuse and abuse.

---

[14] While the prosecutor dismissed such hypotheticals during the Rule 29 oral argument as the sort of cases that the government "wouldn't bring", that provides little comfort. See United States v. Nosal, 676 F.3d 854, 862 (9th Cir. 2012) ("The government assures us that, whatever the scope of the [statute at issue], it won't prosecute minor violations. But we shouldn't have to live at the mercy of our local prosecutor."); cf. United States v. Stevens, 559 U.S. 460, 480, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) ("Not to worry, the Government says: The Executive Branch construes [the statute to reach certain conduct] and it neither has brought nor will bring a prosecution for anything less. . . . But [we are not] at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.")).

*Case No.: 3:13cr48/RV*

For these reasons, I conclude that "materiality" is a required element for this offense. With that understanding, I will consider the defendant's sufficiency of the evidence argument.[15]

After close and careful review of the evidence introduced during trial, and for all the reasons I gave during my oral ruling on the Rule 29 motion, I have concluded that there is insufficient evidence that the defendant violated the Lacey Act. Even if it is assumed that the January 2011 email and letter contained falsehoods, those falsehoods were not material. When the correspondences were drafted in early and mid January 2011, the attempted sale of the elephant tusks had been aborted, and there is insufficient evidence to contradict the claim that, at that particular point in time, the defendant intended to donate them to a museum. Because any falsehoods in the correspondences did not concern an important fact with the natural tendency to influence or was capable of influencing the recipient at that time, any falsehoods were not material. Indeed, I note again that defendant is charged with drafting the January 16th letter to FWS (count 3), even though there is no record evidence that he ever actually sent the letter to FWS. See supra note 4.

Accordingly, counts 2 and 3 fail for insufficiency of evidence.

## IV. Conclusion

For the reasons stated above and as further stated during my oral ruling from

---

[15] While opposing defendant's Rule 29 motion, the government argued that, with respect to the Lacey Act charges, "there are other ways the case could have been brought." The prosecutor stated, for example, that it could have been filed under what is generally known as "the false statement statute." See 18 U.S.C. § 1001. Incidentally, I note that if the conduct had been charged under that statute, materiality would have still been required. See, e.g., United States v. House, 684 F.3d 1173, 1203 (11th Cir. 2012) (materiality is a required element under Section 1001); see also 11th Circuit Pattern Jury Instruction (Criminal) Offense Inst. No. 36 (stating that materiality is a required element under the false statement statute and advising that juries must be instructed accordingly).

*Case No.: 3:13cr48/RV*

the bench after the close of evidence, the defendant's Rule 29 motion for judgment of acquittal on all counts is GRANTED, and judgment will be entered accordingly.

DONE and ORDERED this 12th day of November, 2013.

/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge

*Case No.: 3:13cr48/RV*